UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SAVANAH SMITH AND THANH-THANH HOANG,<br><br>          Plaintiffs,<br><br>     v.<br><br>COUNTY OF SANTA CRUZ, et al.,<br>          Defendants. | Case No. 17-CV-05095-LHK<br>Case No. 17-CV-06594-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 109, 111 |
| LUKE SMITH, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>COUNTY OF SANTA CRUZ, et al.,<br>          Defendants. | |

Plaintiffs Ian Smith, Thanh-Thanh Hoang and Savannah Smith (collectively, "Plaintiffs") brought suit against Defendants County of Santa Cruz, Santa Cruz Sheriff Jim Hart ("Sheriff Hart"), Santa Cruz County Sergeant Jacob Ainsworth ("Sergeant Ainsworth"), Santa Cruz Deputy Chris Vigil ("Deputy Vigil"), Santa Cruz Deputy Jeffrey Eisner ("Deputy Eisner"), and Santa

1

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Cruz Deputy Emma Ramponi ("Deputy Ramponi") (collectively, "Santa Cruz Defendants"); and Defendants City of Capitola and Capitola Police Department ("CPD") Officer Pedro Zamora ("Officer Zamora") (collectively, "Capitola Defendants") for the shooting of Plaintiffs' son and brother, Luke Smith. Before the Court are two motions for summary judgment, one filed by the Santa Cruz Defendants and the other filed by the Capitola Defendants. ECF No. 109[1] ("Santa Cruz Mot."); ECF No. 111 ("Capitola Mot."). Having considered the parties' briefing, the relevant law, and the record in the case, the Court GRANTS IN PART and DENIES IN PART the Santa Cruz Defendants' motion for summary judgment and the Capitola Defendants' motion for summary judgment.

## I.     BACKGROUND

### A.  Factual Background

This case arises from the use of 40 millimeter sponge rounds, a canine, tasers, and an AR-15 assault rifle on, and the death of, Luke Smith ("Luke") on November 19, 2016. Luke is the son of Plaintiffs Thanh-Thanh Hoang and Ian Smith, and the brother of Plaintiff Savannah Smith.

Sometime during the late evening of November 18, 2016, to the early morning hours of November 19, 2016, Luke, who was 15 years old, took LSD with a friend. Luke then went to the house of his father, Plaintiff Ian Smith, at 871 Amesti Rd., in Watsonville ("Amesti residence"). Ian Smith lived at the Amesti residence with Luke's uncle, Mark Woznicki ("Woznicki"). ECF No. 109-1 ("Blechman Decl."), Ex. C ("Ian Smith Dep.") at 155:5–157:9; ECF No. 113, Ex. 1 ("Woznicki Dep.") at 17:18–19:3.

In the month before his death, Luke moved into the Amesti residence with his dad. Before that, Luke Smith lived with his mother and his sister, Savannah Smith, on Provincetown Court in Aptos, California. ECF No. 113-24 ("Thanh-Thanh Hoang Dep.") at 19:11–20:18, 29:12–16, 30:5–31:15, 34:2–10, 35:11–25. Even after moving into his father's house, Luke kept most of his clothes and belongings in his room at his mother's house in Aptos and would visit his mother a

---

[1] All citations refer to the 17-CV-05095-LHK docket unless otherwise noted.

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

couple of times a week during the last month of Luke's life. *Id.* at 78:5–10, 144:20–145:5.

Sometime around 2:30 to 3:00 a.m. in the morning of November 19, 2016, Luke's father, Ian Smith, woke to Luke sitting at the top of the stairs with Luke's friend. Ian Smith Dep. at 156:8–24; Woznicki Dep. at 31:14–16. Luke's friend then left the Amesti residence. Ian Smith Dep. at 157:8–25. Luke's uncle, Woznicki was awoken by Luke screaming "Mark, Mark, Mark," and Ian Smith informed Wozniki that Luke had taken LSD and was "having a bad trip." *Id.* at 159:3–9; Woznicki Dep. at 31:7–9.

Luke asked the two men to go upstairs to his bedroom, so they all went upstairs. Ultimately, Luke took out a knife that was clipped onto his pants and attacked his uncle and father with the knife. Ian Smith Dep. at 165:13–21. Ian Smith and Woznicki tried to keep Luke away with a chair and a surfboard. *Id.* Luke stabbed his uncle Woznicki twice in the chest and once in the forearm. Woznicki Dep. at 58:15–64:15; Ian Smith Dep. at 169:24–170:25. Luke stabbed his father Ian Smith in the chest and, unknown to Ian Smith at the time, Luke also stabbed Ian Smith in the back. Ian Smith Dep. at 167:24–169:5, 172:23–174:12.

After he was stabbed, Ian Smith ran down the stairs, Luke followed, and then Luke ran out the front door. *Id.* at 171:3–25. Woznicki Dep. at 64:6–15. Ian Smith locked the door. Ian Smith Dep. at 171:19–25. Both Ian Smith and Woznicki were seriously injured and called 911. *See id.*; ECF No. 109, Ex. H (911 Calls); *id.*, Ex. I (Photos of Stabbing Victims). In one of the calls, Ian Smith pleads with the 911 operator that Woznicki is bleeding out, that Luke is the person who inflicted the stab wounds, that Luke is on LSD, and Ian Smith states "don't kill him, he's my son." ECF No. 109, Ex. H (911 Calls) at SCC 454. Ultimately, both Ian Smith and Woznicki were taken by ambulance from the Amesti residence and then each airlifted to the hospital. Woznicki Dep. at 78:20–79:5. Both men survived.

Several fire/medical and police personnel responded to the 911 calls. CalFire employees (and EMT's) James Kelly ("Kelly") and Jake Holmes ("Holmes") were among those who went to the Amesti residence. ECF No. 109, Ex. J ("Kelly Dep.") at 9:10–15, 12:23–13:8, 18:15–20:11;

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ECF No. 109, Ex. K ("Holmes Dep.") at 8:3–9:22, 12:1–20. Because the scene was not secure, Kelly and Holmes had to "stage in the area" and wait for the police to come and secure the scene. Kelly Dep. at 19:23–20:10. As Kelly and Holmes got to the area, they saw a subject matching the description of Luke on the roadway, waving his arms and looking panicked and disheveled, so Kelly and Holmes locked the doors. Kelly Dep. at 23:7–29:6; Holmes Dep. at 13:17–20:25. Luke jumped on the sideboard of the engine, saying "[t]hey need help," and Kelly and Holmes yelled at Luke to get off. Holmes Dep. at 19:19–23:25. At first, Luke did not respond and just stared at Kelly and Holmes through the window. *Id.* Once Luke got off the sideboard of the engine, Holmes told Kelly, who was driving, to "[j]ust go. Punch it." Luke walked away and then turned back around and tried to jump up on the rear tailboard of the engine, but fell off as Kelly accelerated away from Luke. *Id.* at 24:1–25; Kelly Dep. at 72:25–73:20.

The moments leading up to Luke's death are captured by a body camera. ECF No. 113-20, Ex. 19 ("Body Camera"); ECF No. 113-21, Ex. 20 ("Video Segment"). The Court describes those videos and other evidence below.

The incident occurred on a stretch of Pioneer Road, where there was a barbed wire fence and empty field on the right, and a wooden fence and residential homes on the left. ECF No. 109-4, Ex. M ("Vigil Dep.") at 123:2–11; ECF No. 109-5, Ex. Q ("Photos of Area of Incident"). The parties do not dispute that Luke had a knife when interacting with officers.

Deputy Vigil was a senior patrol deputy and the first officer on scene. The parties do not dispute that Deputy Vigil coordinated the response prior to Sergeant Ainsworth's arrival. Santa Cruz Mot. at 7; Opp'n to Santa Cruz at 4. However, Plaintiffs assert that Sergeant Ainsworth never relieved Deputy Vigil of control once he arrived. Other officers who eventually arrived on scene included Deputies Eisner, Ramponi, Rakes, and Officer Zamora, as well as CPD Officer Long, WPD Sergeant Trujillo, and CPD Officers Noe Hernandez and Valadez.

After Deputy Vigil arrived at the scene, Deputy Vigil spoke with Luke over the patrol car's PA system. Deputy Vigil stated over the PA system from within the car to "put the knife down

1  buddy." Body Camera. At this point, Deputy Vigil had a taser and his partner Fulton had a firearm

2  available. *Id.* The deputies noted that Luke kept walking back and forth toward and away from

3  them. *Id.* From the camera's point of view, it appears that the deputy wearing the body camera

4  steps partially out of the patrol car. *Id.* Deputy Vigil continued talking to Luke and reiterated that

5  the officers wanted to help Luke, but that Luke needed to put the knife down first. Luke's position

6  is unclear at this point because it appears that the officer wearing the camera is standing behind the

7  open door of the patrol car, and thus the view of Luke is obscured. *Id.*

8      The body camera video shows that Deputy Vigil next asked Luke if he did any drugs, and

9  Luke can be heard responding "LSD." *Id.* Deputy Vigil then asked, "do you realize you have cops

10 in front of you?" *Id.* Luke's response cannot be heard. *Id.* The body camera video shows that

11 Deputy Vigil gave Luke various commands, such as to open his hand, to lay down on the ground,

12 to put the knife down, and to not come any closer. *Id.* Deputy Vigil told Luke over the PA system:

13 "We know you're under the influence, LSD's a tough thing, 'cause it's hard to differentiate

14 between reality and what's not, right? So let's take this nice and slow, OK?" *Id.* Deputy Vigil then

15 told Luke to put the knife down, stop, and "don't get any closer." *Id.* Although it is unclear where

16 Luke is because the body camera is still mostly blocked by the patrol car door, Deputy Vigil gives

17 out the instruction for "taser," someone yells "less lethal," and an officer—WPD Officer Noe

18 Hernandez—fires a 40 millimeter sponge round. *Id.*; ECF No. 113-11, Ex. 10 ("Hernandez Dep.")

19 at 26:23–27:7. Deputy Vigil testified that at this point Luke was walking "back and forth[,] so

20 towards us and away from us a little bit" and that the closest Luke got to the patrol car was "about

21 a car and a half to two car lengths roughly," or anywhere from "20 to 40 feet." Vigil Dep. at

22 140:9–141:9. Multiple officers then shouted, "drop the knife," and Officer Hernandez fired a

23 second 40 millimeter sponge round. Body Camera. Officers again shouted for Luke to "drop the

24 knife," and Officer Hernandez fired a third 40 millimeter sponge round. *Id.* Luke then appears to

25 head off towards the wooden fence and the houses to the left of the road. *Id.*

26     Deputy Vigil can be heard on the body camera directing the other officers to move the

27                                                 5

28 Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

patrol cars up. *Id.* Deputy Vigil can also be heard acknowledging "serge"—as in Sergeant Ainsworth. *Id.* The officers then can be heard discussing what force options they had, including 40 millimeter sponge rounds, tasers, AR-15 rifle, and pistol. *Id.*

Deputy Vigil then took out his AR-15 and made repeated commands on the PA for Luke to come back out to the road with his hands up. Vigil Dep. at 156:1–20; Body Camera. At this point, the barking of a dog can be heard. *Id.* Deputy Vigil then handed the PA off to another officer to give commands to Luke. *Id.* That officer made similar commands related to telling Luke to put the knife down.

Deputy Vigil took over control of the PA again and can be heard telling Luke to "put the knife down buddy" followed by a "good job Lucas. Can you come over the fence?" *Id.*

The exhibit containing the body camera video then skips to video recorded by a Capitola Police body camera. *Id.* Deputy Vigil can be heard directing Luke to "stand right here by the line." *Id.* The body camera video then shows several officers begin to approach Luke on the left side of the road, including Officer Zamora, who was holding the canine, *Kato*. *Id.*; Vigil Dep. at 164:1–19. At this point, Luke was crouched down on all fours. Vigil Dep. at 163:10–23. Deputy Vigil continues making commands over the PA, including telling other officers that "we can't see his hands, don't move up." Body Camera. The officers stop approaching for a few seconds. *Id.*

Officer Zamora, with the canine, Deputy Vigil, Deputy Eisner, Deputy Ramponi, and Officer Hernandez then all advanced on Luke on the left side of the road where Luke was in the grass in front of the wooden fence, without using any cover to shield themselves. *Id.*; Vigil Dep. at 166:17–168:22. Luke was laying on the ground when officers approached Luke in a semi-circle type configuration. Body Camera; ECF No. 113-8, Ex. 7 ("Zamora Dep.") at 88:23–25. As the officers approached, Luke slowly stood up with his hands down by his sides and his left hand open. *Id.* Officers observed the knife in his right hand, but the body camera video shows that Luke keeps his hand low. *Id.* The officers then yelled various commands and as Luke stood up, Deputy Eisner tased Luke. *Id.* Around the same time, Officer Zamora released the canine on Luke. *Id.*

Only a second or so later, Officer Hernandez fired a 40 millimeter sponge round at Luke. *Id.*; ECF No. 109–6, Ex. T ("Hernandez Dep.") at 38:3–42:13.

The body camera moves around, but Luke appears to react and try to shake the canine off of him. Body Camera. The body camera video shows officers continuing to yell at Luke to drop the knife as Luke struggles with the canine that is lashing and biting Luke's arm. *Id.* Finally, at one point, with the canine lower than him, Luke raises his right arm. *Id.* At this point, Deputy Vigil fires the AR-15, hitting Luke, and Luke falls to the ground. *Id.*

With Luke on the ground, the officers continued to yell commands to "drop the knife." *Id.* More than twenty seconds after being shot, Officer Hernandez fired another 40 millimeter sponge round at Luke. *Id.* Officers continued to yell instructions to drop the knife, but Luke does not move and appears to be clutching his body. *Id.* The autopsy report later showed that Luke suffered a "thoracic spine with cord injury," and Plaintiffs' medical expert testified that this meant that the bullet had transected Luke's spine, meaning that if Luke had survived the gunshot wound "he would have had significant movement impairment, maybe paralysis." ECF No. 113-16, Ex. 15 ("Autopsy Report"); ECF No. 113-18, Ex. 17 ("Omalu, M.D. Dep."). Deputy Ramponi then fired another 40 millimeter sponge round at Luke and someone deployed a taser. *Id.* Officer Zamora then again deployed the canine at Luke, and the canine shook Luke's right arm for several seconds until the knife was freed from Luke's hand. *Id.* Officers then treated Luke. *Id.* Ultimately, Luke died from the injuries he suffered.

**B. Procedural History**

Plaintiffs Thanh-Thanh Hoang (Luke's mother) and Savannah Smith (Luke's sister) filed their original complaint in case number 17-CV-05095-LHK on September 1, 2017. ECF No. 1. Plaintiff Ian Smith (Luke's father) filed his original complaint in case number 17-CV-06594-LHK on November 15, 2017. 17-CV-06594-LHK, ECF No. 1. On November 27, 2017, the Court related the two cases, and on June 25, 2018, the Court consolidated the two cases. ECF Nos. 45 & 59.

1    On July 12, 2018, Ian Smith filed his amended complaint, and on July 19, 2018, Thanh-

2    Thanh Hoang and Savannah Smith filed their amended complaint. ECF Nos. 62, 64. Plaintiffs

3    asserted claims against the Santa Cruz Defendants and the Capitola Defendants. *See id.* Plaintiffs

4    also asserted claims against CPD Chief Terry McManus ("Chief McManus"), as well as the City

5    of Watsonville, Watsonville Police Department ("WPD") Chief David Honda, and WPD Officer

6    Hernandez, who have since been dismissed with prejudice by stipulation. *Id.*; ECF Nos. 91, 93,

7    107 & 108. On August 1, 2018 and August 8, 2018, the Capitola Defendants answered the

8    amended complaints. ECF Nos. 66 & 70. On August 20, 2018, the Santa Cruz Defendants

9    answered the amended complaints. ECF Nos. 71 & 72.

10    On April 1, 2019, the Santa Cruz Defendants filed their instant motion for summary

11    judgment. *See* Santa Cruz Mot. On April 1, 2019, the Capitola Defendants also filed their instant

12    motion for summary judgment. *See* Capitola Mot. On April 18, 2019, Plaintiffs filed a combined

13    opposition to the Santa Cruz Defendants' motion for summary judgment. ECF No. 113 ("Opp'n to

14    Santa Cruz"). On April 18, 2019, Plaintiffs also filed a combined opposition to the Capitola

15    Defendants' motion for summary judgment. ECF No. 114 ("Opp'n to Capitola"). The Santa Cruz

16    Defendants replied on April 30, 2019. ECF No. 115 ("Santa Cruz Reply."). The Capitola

17    Defendants also replied on April 30, 2019. ECF No. 116 ("Capitola Reply.").

18    **II.    LEGAL STANDARD**

19    Summary judgment is proper where the pleadings, discovery, and affidavits show that

20    there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

21    a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of

22    the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material

23    fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

24    nonmoving party. *See id.*

25    The party moving for summary judgment bears the initial burden of identifying those

26    portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue

27

28
Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

Additionally, when, as here, there is videotape evidence of the incident in question, the Court at summary judgment must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## III. DISCUSSION

The parties combine the discussion of Ian Smith's claims and Thanh-Thanh Hoang and Savannah Smith's claims in the instant motions for summary judgment. Therefore, the Court does the same.

Plaintiffs' first cause of action is brought under 42 U.S.C. § 1983 and asserts that: (1) Defendants Deputies Eisner, Ramponi, and Vigil, and Officer Zamora violated Luke's right to be free from excessive force as secured by the Fourth Amendment ("excessive force claim"); and (2) Defendants Deputies Eisner, Ramponi, and Vigil, Sergeant Ainsworth, and Officer Zamora violated Plaintiffs' right to be free wrongful government interference with familial relationships, and Plaintiffs' and Luke's right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments ("right to familial relationship claim"). ECF Nos. 62, 64.

Plaintiffs' second cause of action is brought under 42 U.S.C. § 1983 against Defendants County of Santa Cruz, Sherriff Hart, and the City of Capitola for municipal liability ("*Monell*

9

claim") and against Sergeant Ainsworth for supervisory liability ("supervisory liability claim").

Plaintiffs' third cause of action is brought for violation of civil rights under California Civil Code § 52.1 ("Bane Act claim") against Sergeant Ainsworth, Deputy Vigil, Deputy Eisner, Deputy Ramponi, the County of Santa Cruz, Officer Zamora, and the City of Capitola.

Plaintiffs' fourth cause of action[2] is for negligence ("negligence claim") and is brought against Sergeant Ainsworth, Deputy Vigil, Deputy Eisner, Deputy Ramponi, the County of Santa Cruz, Officer Zamora, and the City of Capitola.

Plaintiffs' fifth cause of action is for assault ("assault claim") and battery ("battery claim") and is brought against Sergeant Ainsworth, Deputy Vigil, Deputy Eisner, Deputy Ramponi, the County of Santa Cruz, Officer Zamora, and the City of Capitola. ECF Nos. 62, 64.

Below, the Court first discusses the Santa Cruz Defendants' motion for summary judgment in Section III.A. The Court second discusses the Capitola Defendants' motion for summary judgment in Section III.B.

**A. Santa Cruz Defendants' Motion for Summary Judgment**

Santa Cruz Defendants argue that: (1) Plaintiffs' § 1983 excessive force claim fails; (2) Plaintiffs' supervisory liability claim against Sergeant Ainsworth fails; (3) Plaintiffs' *Monell* claim against the County of Santa Cruz and Sheriff Hart fails; (4) Plaintiffs' § 1983 right to familial relationship claim fails; and (5) Plaintiffs' related state law claims also fail. *See* Santa Cruz Mot. The Court considers each argument in turn.

**1. Section 1983 Excessive Force Claim**

Plaintiffs allege that Santa Cruz Defendants Deputy Eisner, Deputy Ramponi, and Deputy Vigil violated Luke Smith's Fourth Amendment rights by using excessive and ultimately deadly force on him. Specifically, Plaintiffs take issue with Deputy Eisner's use of the taser, Deputy Vigil's use of the AR-15, and Deputy Ramponi's use of the 40 millimeter sponge round launcher.

---

[2] Thanh-Thanh Hoang and Savannah Smith also brought a claim for violation of Cal. Civil Code § 51.7, ECF No. 64, but have agreed to dismiss that claim. ECF No. 109 n.2. The parties shall file a stipulation of dismissal of this claim with prejudice by June 21, 2019.

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The Santa Cruz Defendants argue that summary judgment is appropriate on Plaintiffs' § 1983 excessive force claim because Deputy Eisner, Deputy Ramponi, and Deputy Vigil used objectively reasonable force and therefore did not violate the Fourth Amendment, and because the deputies are entitled to qualified immunity. Santa Cruz Mot. at 17–21.

As an initial matter, Defendants urge the Court to separate and evaluate the conduct of each of the deputies in a vacuum. Santa Cruz Reply at 6–11. However, Defendants' request is inappropriate because the Fourth Amendment analysis requires the Court to consider the totality of the circumstances. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) ("The question was whether the totality of the circumstances justified a particular sort of search or seizure."); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) ("Even excluding the question of whether the police dog constituted deadly force, a jury well could find that, given the circumstances, the totality of force used—four blasts of pepper spray, slamming Smith down onto the porch, dragging him off the porch face down, ordering the canine to attack him three times, and the resultant dog bites and physical assaults on his body—was unreasonable."); *County of L.A. v. Mendez*, 137 S. Ct. 1539, 1547 n.1 (2017) ("*Graham* commands that an officer's use of force be assessed for reasonableness under the 'totality of the circumstances.'"); *see also, M.H. v. Cty. of Alameda*, 62 F. Supp. 3d 1049, 1094 (N.D. Cal. 2014) ("The County's reliance on Ninth Circuit decisions finding qualified immunity for the use of a Taser is unavailing. The County's argument depends on separating the use of Tasers from the rest of the altercation. But Plaintiffs premise their excessive force claim here on the combination of the different types of force used in this case, not simply the use of Tasers, and it is the 'totality of force' that must be evaluated in an excessive force case.").[3] Thus,

---

[3] That is not to say the "integral participant" theory applies here. The integral participant theory appears to apply in struggle situations in which the plaintiff could not "identify precisely which officer delivered which blow or use of force." *Lolli v. Cty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003). In *Lolli*, for instance, the Ninth Circuit permitted the plaintiff in a struggle situation to rely on the deputies' own admissions that they were involved in the altercation and exerted some physical force on him to create the inference that the deputies were "integral participants in the alleged unlawful act," *id.* at 18, meaning the plaintiff could show each defendant was liable even though "each officer's actions themselves [did not] rise to the level of a constitutional violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). This type of struggle

11

1  the Court discusses the totality of the circumstances to evaluate the objective reasonableness of the

2  force used by each individual Defendant.

3        The Court now turns to the qualified immunity analysis.

4        **a.  Legal Standard for Qualified Immunity**

5        "The doctrine of qualified immunity shields officials from civil liability so long as their

6  conduct does not violate clearly established statutory or constitutional rights of which a reasonable

7  person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). Qualified

8  immunity "gives government officials breathing room to make reasonable but mistaken judgments

9  by protecting all but the plainly incompetent or those who knowingly violate the law." *City &*

10 *County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks and

11 brackets omitted). The qualified immunity analysis "must be undertaken in light of the specific

12 context of the case, not as a broad general proposition." *Mendez v. County of Los Angeles*, 815

13 F.3d 1178, 1186 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), *overruled on*

14 *other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). "To determine

15 whether an officer is entitled to qualified immunity, [the Court] ask[s], in the order [it] choose[s],

16 (1) whether the alleged misconduct violated a [constitutional] right and (2) whether the right was

17 clearly established at the time of the alleged misconduct." *Hernandez v. City of San Jose*, 897 F.3d

18 1125, 1132 (9th Cir. 2018) (quoting *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th

19 Cir. 2013)) (alterations in *Hernandez*); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009)

20 (same). Qualified immunity applies unless the answer to both questions is "yes." *See Pearson*, 555

21 U.S. at 232.

22       **b.  Whether There Has Been a Violation of a Constitutional Right**

23       Whether the alleged misconduct violated a constitutional right depends on whether or not

24 the deputies' use of force against Luke was objectively reasonable. The Court discusses use of

25 force law then the Santa Cruz deputies' use of force in the instant case.

26

27 situation does not apply here.

28 Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY
   JUDGMENT

i. **Law on Use of Force**

The Fourth Amendment permits law enforcement to use "objectively reasonable" force. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Such an inquiry requires the Court to "consider the totality of the circumstances." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc) (citation omitted). "Factors for evaluating reasonableness include, but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citing *Graham*, 490 U.S. at 396). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.* (quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)).

"Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *Id.* (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)). "An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez*, 747 F.3d at 793 (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)). "With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available[,] so long as they act within a range of reasonable conduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016), *overruled on other grounds by Kisela v. Hughes*, 138 S. Ct. 1148 (2018)).

Below, the Court addresses the four reasonableness factors set forth in *S.B.*

ii. **Analysis of Reasonableness Factors**

The parties do not dispute the first reasonableness factor: severity of the crime. Santa Cruz Mot. at 18. Indeed, Plaintiffs concede that "Luke had clearly committed a serious offense when he stabbed his father and uncle." Opp'n to Santa Cruz at 15. However, the parties dispute the

13

objective reasonableness of the deputies' conduct, and the Court finds that a genuine dispute of material fact exists as to the second, third, and fourth reasonableness factors: (1) whether Luke posed an immediate threat to the safety of officers or others; (2) whether Luke actively resisted arrest or attempted to escape; and (3) "other relevant factors." The Court addresses each in turn.

### a. Whether Luke Posed an Immediate Threat

Defendants' portray the facts as follows. After Luke had dropped the knife, "he rearmed himself, an indication to a reasonable officer that he was ready to attack officers (or nearby residents)." Santa Cruz Mot. at 18. Defendants also argue that Luke "was wanted for felony crimes, did not respond to lawful commands, did not surrender and was still armed and perceived to be moments away from coming at officers with the knife, leading to the lone gunshot." Santa Cruz Mot. at 21. Defendants further argue that "[Luke] fought through the use of the Taser by Eisner, [Luke] shrugged off the 40 mm sponger round by WPD Ofc. Hernandez, then deflected the canine deployed by CPD Ofc. Zamora," and that "[Luke] quickly raised the knife arm up in the air." Santa Cruz Reply at 2.

Plaintiffs' portray the facts as follows. When the officers approached Luke in the semi-circle, even though Luke had the knife, "Luke stood up with his hands down by his sides, and his left hand open as if in surrender," and that the "Defendants continued to advance, with no apparent fear for their own safety." Opp'n to Santa Cruz at 8; *see, e.g., Glenn*, 673 F.3d at 874 ("Viewing the evidence in the light most favorable to the plaintiff even though Lukus remained in possession of the pocketknife, a jury could conclude that at the moment the officers shot him with the beanbag gun there was little evidence that he posed an "immediate threat" to anybody."). Plaintiffs also assert that the officers' actions may have escalated the situation. *See, e.g.*, *Glenn*, 673 F.3d at 876 ("She suggests that rather than immediately drawing their weapons and shouting commands and expletives at Lukus, which predictably escalated the situation instead of bringing it closer to peaceful resolution."). Plaintiffs assert that Luke did not pose an immediate threat because "Luke never took a step toward officers in any threatening manner—he was merely, practicably, flailing

14

United States District Court
Northern District of California

and reacting" or "recoiling in pain" from "being Tased, struck by more 40 mm projectiles, and attached by a police dog." Opp'n to Santa Cruz at 9, 16; *Glenn*, 673 F.3d at 878–79 ("'[T]he officers' decision to employ the beanbag gun is critical to the resolution of' the reasonableness of the lethal force as well '[b]ecause the use of less-lethal force precipitated the use of deadly force.' Before Lukus was shot with the beanbag shotgun, he had not moved from the position he was in at the time officers arrived, and showed no signs of attempting to do so. He moved only after being struck by the beanbag rounds, which have sufficient force to "knock[ ] [someone] off his feet.' Lukus' movement in reaction to the beanbag fire—which a jury could conclude was a predictable consequence of using the beanbag shotgun—prompted the officers' lethal force."). Plaintiffs also argue that at the time he was shot, Luke was being bitten by the canine, and that both Deputies Eisner and Deputy Ramponi testified that it looked like Luke may have been trying to stab the canine, so "[a] jury could conclude that Defendant Vigil shot Luke to save *Kato*[ ] given[] the testimony provided by Defendants Ramponi and Eisner, and given that the video shows the canine in between Luke and Defendant Zamora," rather than to protect the other officers. *Id.* at 10. Plaintiffs also cite that Luke was shot in the back. Opp'n to Santa Cruz at 16. After Luke had been shot and was laying on the ground, Plaintiffs cite that Deputy Ramponi fired a 40 millimeter sponge round at Luke: "Luke did not react, as any reasonable officer could see, because he was paralyzed given that the bullet had 'transected' his spinal cord" and that "Luke 'would have had significant movement impairment, maybe paralysis.'" *Id.* at 11. Further, "with Luke paralyzed, he was 'totally passive' and there was 'no reason from what the officers just saw that they couldn't go up there and use control holds on a totally passive person and take the knife away if, in fact, it was in his hand.'" *Id.*

The body camera video and evidence in the record support both parties' portrayal of the facts. Thus, there is a genuine dispute of material fact as to the reasonableness factor concerning whether Luke posed an immediate threat.

**b. Whether Luke Actively Resisted Arrest or Attempted to Escape**

United States District Court
Northern District of California

Defendants' portrayal of the facts is that "[o]fficers were trying to control and arrest Smith, a felony suspect who had stabbed two family members only minutes before, was fleeing, still armed with the knife, was not surrendering and was in close proximity to officers and the public." Santa Cruz Mot. at 18.

Plaintiffs' portrayal of the facts is that "[t]here is no indication that [Luke] was about to escape with a dog attached to his person and while surrounded by numerous law enforcement officers who were at the time using a variety of weapons to contain [Luke]." Opp'n to Santa Cruz at 10.

The body camera video and evidence in the record support both parties' portrayal of the facts. Thus, there is a genuine dispute of material fact as to the reasonableness factor concerning whether Luke actively resisted arrest or attempted to escape.

### c. Other Relevant Factors

Finally, Plaintiffs also cite other relevant factors, like whether the deputies were trying to quickly resolve the situation with Luke. Specifically, Plaintiffs reiterate that to the extent the facts demonstrate that the deputies were trying to quickly resolve the situation with Luke, that would not, standing alone, justify use of force. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used."). Defendants respond that their decision was a split-second decision made in self-defense. Santa Cruz Reply at 2.

The body camera video and evidence in the record support both parties' portrayal of the facts. Thus, there is a genuine dispute of material fact as to the reasonableness factor concerning "other relevant factors."

### d. Conclusion as to Reasonableness of Use of Force

Based on the totality of the circumstances, the Court concludes that there is a genuine

16

dispute of material fact as to whether Deputy Eisner, Deputy Ramponi, and Deputy Vigil used objectively reasonable force, and in turn, whether each deputy's use of force violated Luke's Fourth Amendment rights as a matter of law. *Graham*, 490 U.S. at 396–97.

### c. Whether the Right was Clearly Established at the Time of the Alleged Misconduct

As for the second question in the qualified immunity analysis, officers are entitled to qualified immunity where their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation omitted). For a constitutional right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix*, 136 S. Ct. at 308. To do so, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quotation added).

Here, the Court cannot resolve the parties' dispute as to whether Deputies Eisner, Ramponi, and Vigil's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. This is because both parties' arguments depend on whether or not Luke posed an immediate threat at the time the deputies tased, fired a 40 millimeter sponge round, and shot Luke, and the Court has already found a genuine material dispute as to that fact. *See, e.g.*, *Lolli*, 351 F.3d at 421 (rejecting the officers qualified immunity argument "[b]ecause of the factual disputes that Lolli has identified"); *see Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)) ("[W]hether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend on the jury's resolution of disputed facts and the inferences it draws therefrom. Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful."); *M.H.*, 62 F. Supp. 3d at 1094 ("[T]he core issue for Plaintiffs' excessive force claim is a factual determination of . . . whether that amount of force was excessive given the circumstances. In such situations, a determination on qualified immunity will rarely be appropriate at summary

17

judgment."); *Rosenblatt v. City of Hillsborough*, 2013 WL 6001346, at *15–16 (N.D. Cal. Nov. 12, 2013) (finding that officers were not entitled to qualified immunity for use of excessive force because "the issues of disputed fact preclude a determination at this point" on qualified immunity, and "Defendants' argument relies on their version of the facts"); *McCloskey v. Courtnier*, 2012 WL 646219, at *3 (N.D. Cal. Feb. 28, 2012) ("Consequently, because the facts relevant to the issue of qualified immunity are inextricably intertwined with the disputed facts relevant to the issue of excessive force, defendants are not entitled to summary adjudication on the issue of qualified immunity.").

Accordingly, the Court cannot conclude at this juncture that the deputies are entitled to qualified immunity on Plaintiffs' excessive force claim. Thus, the Court DENIES the Santa Cruz Defendants' motion for summary judgment as to the § 1983 excessive force claim against Deputies Eisner, Ramponi, and Vigil.

### 2. Section 1983 Supervisory Liability Claims Against Sergeant Ainsworth

Plaintiffs allege § 1983 claims for supervisory liability against Sergeant Ainsworth. Santa Cruz Defendants argue that summary judgment is appropriate on Plaintiffs supervisory liability claims against Sergeant Ainsworth because Sergeant Ainsworth did not use any force; because Sergeant Ainsworth "is not vicariously liable for force of other officers who are also trying to control the situation"; and because Sergeant Ainsworth cannot be held "liable for merely being present at the scene or being a member of the same operational unit." Santa Cruz Mot. at 21–22. Plaintiffs oppose and argue that "Sergeant Ainsworth, who watched and supposedly directed all of the other deputies and officers is liable as a supervisor" and that "Sergeant Ainsworth never attempted to control this incident" because "[h]e stayed behind the police car and provided no plan or direction to the other officers." Opp'n to Santa Cruz at 21.

A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652

18

F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

"The requisite causal connection can be established ... by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (internal quotation marks and citations omitted) (alterations in original). Thus, a supervisor may "be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Keates v. Koile*, 883 F.3d 1228, 12443 (9th Cir. 2018) (*quoting* Starr, 652 F.3d at 1208).

Turning to the instant case, the Court finds that the Santa Cruz Defendants are entitled to summary judgment on Plaintiffs' supervisory liability claim against Sergeant Ainsworth. First, the Court agrees with Defendants that Sergeant Ainsworth did not himself use any force towards Smith. Thus, that cannot be a basis for finding Sergeant Ainsworth liable. Second, however, Plaintiffs put forth inconsistent theories as to Sergeant Ainsworth's liability. On the one hand, Plaintiffs argue that Sergeant Ainsworth directed and controlled the other deputies and therefore is liable for his participation. Opp'n to Santa Cruz at 21. On the other hand, however, Plaintiffs argue that Sergeant Ainsworth never attempted to control the incident because he stayed behind the police car and provided no plan or direction to the other officers. *Id.* Nonetheless, neither of Plaintiffs' theories provide support for a finding of liability against Sergeant Ainsworth because Plaintiffs fail to identify specifically that Sergeant Ainsworth directed any of the violations or knew violations were occurring and failed to prevent them. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.").

Accordingly, the Court GRANTS summary judgment in favor of Sergeant Ainsworth as to

United States District Court
Northern District of California

Plaintiffs' supervisory liability claim.

### 3. *Monell* Claim Against the County of Santa Cruz and Sheriff Hart

Plaintiffs' allege that Defendants Santa Cruz and Sheriff Hart are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Santa Cruz Defendants argue that summary judgment is appropriate on Plaintiffs' *Monell* claims.

To establish *Monell* liability, a plaintiff must establish: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Sternberg v. Town of Danville*, 2015 WL 9024340, at *3 (N.D. Cal. Dec. 16, 2015); *see also Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (outlining these factors). The Court discusses each of these factors in turn.

The first factor is whether Luke possessed a constitutional right of which he was deprived. As the Court already discussed above, a fact question exists as to whether or not Deputies Eisner, Vigil, and Ramponi violated Luke's Fourth Amendment rights.

The second factor is that the municipality had a policy, custom, or practice. Recognized paths to *Monell* liability include: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train; and (3) a final policy-maker's involvement in, or ratification of, the unconstitutional decision or action and the basis for it. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Although Plaintiffs' complaints plead multiple bases for *Monell* liability, their opposition to the instant motion for summary judgment focuses only a failure to train theory. *See* Opp'n to Santa Cruz at 22 ("[T]he failure of not only the supervisor (Sgt. Ainsworth) but all of the officers at the scene to follow those generally accepted standards was due to an established practice of the Sheriff's Office and failure to properly train and direct supervisors and deputies."). Plaintiffs set forth two arguments

United States District Court
Northern District of California

related to the County of Santa Cruz and Sherriff Hart's failure to train: (1) that the County of Santa Cruz and Sheriff Hart "failed to conduct reality-based use of force training, without which 'officers only learn the skill of *how* to use force but are not provided with the essential skill of *when* to [use] force"; and (2) that the County of Santa Cruz and Sheriff Hart failed to provide training in areas noted by the Serious Incident Review Board ("SIRB"), and that the County, after receiving recommendations from the SIRB to improve the handling of crisis situations after the incident with Luke, implemented the SIRB reforms. *Id.* at 11–12, 22. Plaintiffs have thus set forth facts as to this second factor.

However, as to the third and fourth factors, whether the County of Santa Cruz and Sheriff Hart's failure to train "amount[s] to deliberate indifference to the plaintiff's constitutional rights," and "was the moving force behind the constitutional violation," the Court finds that Plaintiffs have failed to set forth facts showing that there is a genuine issue of material fact. Fed. R. Civ. P. 56(e). Specifically, Plaintiffs failed to identify any inadequacy in the training the Santa Cruz deputies received, and thus Plaintiffs have not shown deliberate indifference. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[I]t is therefore difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate."); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."). For instance, there is no evidence in the record of any other unconstitutional use of force or shooting incidents other than the incident at issue in the instant case. *Id.* at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Moreover, Defendants set forth

21

evidence that the County of Santa Cruz had applicable use of force and crisis intervention policies and that the Santa Cruz Defendants were trained in these areas. *See, e.g.,* ECF No. 109-9, Ex. LL ("Santa Cruz County Sheriff's Officer Policy Manual"); *id.*, Ex. MM ("Santa Cruz County Sheriff's Office: Individual Training Activity"). Accordingly, the Court finds that Plaintiffs have failed to set forth proof of factors three and four.

Thus, the Court GRANTS Santa Cruz Defendants' motion for summary judgment on Plaintiffs' *Monell* claim.

### 4. Section 1983 Right to Familial Relationship Claim

Plaintiffs allege a § 1983 claim for loss of familial relationship under the First and Fourteenth Amendments against Sergeant Ainsworth, Deputy Vigil, Deputy Eisner, Deputy Ramponi, and Officer Zamora. Santa Cruz Defendants move for summary judgment on this claim and argue: (1) that Plaintiff Savannah Smith has no standing to assert this claim; and (2) Santa Cruz Defendants are entitled to summary judgment on this claim because Plaintiffs cannot show that the Santa Cruz Defendants acted with a purpose to harm Luke that was unrelated to legitimate law enforcement objectives. Santa Cruz Mot. at 24. The Court considers both arguments in turn.

#### a. Savannah Smith's Standing

The Santa Cruz Defendants argue that because Plaintiff Savannah Smith is the sibling of decedent Luke, she has no cognizable liberty interest in the companionship and society of her deceased brother, and therefore she has no standing. Santa Cruz Mot. at 24 (citing *Ward v. City of San Jose*, 967 F.2d 280, 283–84 (9th Cir. 1991)). Plaintiffs oppose and contest the applicability of *Ward.* Opp'n to Santa Cruz at 23. The Court agrees with Plaintiffs.

In *Ward*, the Ninth Circuit "held that adult, non-cohabitating siblings do not 'possess a cognizable liberty interest in their brother's companionship.'" *Mann v. City of Sacramento*, 748 F. App'x 112, 115 (9th Cir. 2018) (quoting *Ward*, 967 F.2d at 283–84). In the instant case, however, Savannah Smith and Luke were both minors and were attending high school at the time of Luke's death. ECF No. 113-4 ("Savannah Smith Dep.") at 6:22–24, 15:6–16, 83:4–6. Additionally, the

record reflects that Savanah Smith and Luke grew up together, and after their parent's separation, cohabited in their mother's house on Provincetown Court in Aptos, California up until the month before Luke died, when Luke moved in with his dad. Thanh-Thanh Hoang Dep. at 19:11–20:18, 29:12–16, 30:5–31:15, 34:2–10, 35:11–25. Even then, Luke kept most of his clothes and belongings in his room at his mom's house in Aptos and would visit a couple of times a week during the last month of Luke's life. *Id.* at 78:5–10, 144:20–145:5. Thus, the Court finds the holding in *Ward* inapplicable to the instant case and DENIES Santa Cruz Defendant's motion for summary judgment on Savannah Smith's right to familial relationship claim for lack of standing.

### b. Purpose to Harm Unrelated to Legitimate Law Enforcement Objectives

For Plaintiffs' familial relationship claim to survive summary judgment, there must be a genuine dispute of material fact as to whether the officers engaged in conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation" (citation omitted)). The first consideration is "whether the circumstances are such that 'actual deliberation is practical.'" *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (citation omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson*, 610 F.3d at 554 (citing *Moreland*, 159 F.3d at 372). If the officers "did not have time to deliberate, a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objections." *Gonzalez*, 747 F.3d at 797 (citing *Porter*, 546 F.3d at 1137).

Here, the parties agree that the "purpose to harm" standard applies. However, the parties dispute whether Plaintiffs have evidence that the Santa Cruz Defendants acted with a "purpose to harm." Santa Cruz Defendants argue that the officers "had probable cause to arrest [Luke] Smith for the alleged stabbings and when they tried to take him into custody, he resisted and threatened them with the knife up until the point of the gunshot" and that "[t]here is no evidence that officers were doing anything other than legitimately trying to get [Luke] into custody." Santa Cruz Mot. at

23

24. The Court finds that Defendants have met their burden of identifying the portions of pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

In opposition, Plaintiffs argue that "[a] reasonable jury could find that the defendant officers, especially Defendants Ramponi and Zamora, acted without a legitimate law enforcement purpose when they chose to fire a 40 millimeter and sic a canine again on a paralyzed dying boy who had just been shot by an AR-15." Opp'n to Santa Cruz at 23–24 (citing *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (finding that head stomping person who was already shot and on the ground could sustain a due process claim).

The Court discusses Officer Zamora's conduct in Section III.B., which concerns the Capitola Defendants' motion for summary judgment. As to Deputy Ramponi's conduct, the Court agrees with Plaintiffs that a reasonable jury could find that Deputy Ramponi acted without a legitimate law enforcement purpose when she fired a 40 millimeter sponge round after Luke had already been shot by the AR-15. Therefore, the Court DENIES the Santa Cruz Defendant's motion for summary judgment on Plaintiffs' right to familial relationship claim against Deputy Ramponi.

As for Plaintiffs' right to familial relationship claim against Sergeant Ainsworth, Deputy Vigil, and Deputy Eisner, however, Plaintiffs fail to set forth any "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), because they did not cite any evidence supporting a finding that these officers acted with a purpose to harm Luke unrelated to legitimate law enforcement objectives. Thus, these Defendants, as "the moving party[,] [are] entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. Accordingly, the Court GRANTS the Santa Cruz Defendants' motion for summary judgment on Plaintiffs' right to familial relationship claim against Sergeant Ainsworth, Deputy Vigil, and Deputy Eisner.

### 5. State Law Claims

Plaintiffs also bring three state law claims against the Santa Cruz Defendants: (1) Bane Act claim; (2) negligence; and (3) assault and battery. The Court addresses each of these claims in

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

turn.

### a. Bane Act Claim

Plaintiffs bring a Bane Act claim against Sergeant Ainsworth, Deputy Vigil, Deputy Eisner, Deputy Ramponi, and the County of Santa Cruz. The Santa Cruz Defendants move for summary judgment on Plaintiffs' Bane Act claim.

The Bane Act "was enacted in 1987 to address hate crimes" and "protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation, or coercion." *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (internal quotation marks omitted). "Section 52.1 'provides a cause of action for violations of a plaintiff's state or federal civil rights committed by threats, intimidation, or coercion.'" *Id.* (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)). "Claims under section 52.1 may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims." *Id.* at 1040–41. To establish a Bane Act claim, Plaintiffs must ultimately prove "(1) a violation of a 'state or federal constitutional or legal right'; and (2) that the violation was achieved through 'threats, intimidation, or coercion.'" *Inman v. Anderson*, 294 F. Supp. 3d 907, 928 (N.D. Cal. 2018) (quoting *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015)).

Although there had been a dispute among California Courts of Appeal and district courts within the Ninth Circuit about whether the Bane Act "required a showing of coercion independent of the coercion inherent" in a § 1983 excessive force claim, the Ninth Circuit recently adopted a position on this issue that binds this Court. Specifically, in *Reese*, 888 F.3d 1030, the Ninth Circuit followed the California Court of Appeal's decision in *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017), which clarified that "[n]othing in the text of the [Bane Act] requires that the offending 'threat, intimidation or coercion' be independent from the constitutional violation alleged.'" *Reese*, 888 F.3d at 1043 (quoting *Cornell*, 255 Cal. Rptr. 3d at 383). The Ninth Circuit stated:

United States District Court
Northern District of California

> *Cornell* also makes clear, however, that the Bane Act imposes an additional requirement beyond a finding of a constitutional violation. *Cornell* explained that "[p]roperly read, the statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief." *Id.* at 383. Accordingly, Cornell held that "the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* at 384. In so holding, *Cornell* adopted the specific intent standard established in *Screws v. United States*, 325 U.S. 91 (1945), for assessing criminal violations of federal civil rights. 225 Cal. Rptr. 3d at 384–85.

*Reese*, 888 F.3d at 1043.

Accordingly, the Ninth Circuit held that "the Bane Act does not require the threat, intimidation or coercion element of the claim to be transactionally independent from the constitutional violation alleged," but the Bane Act does require "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* (internal quotation marks omitted). "Evidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. June 18, 2018) (citing *Reese*, 888 F.3d at 1045). "Rather, [the plaintiff] must show that [the officer] 'intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances.'" *Id.* (quoting *Reese*, 888 F.3d at 1045).

Here, Santa Cruz Defendants argue that they are entitled to summary judgment on Plaintiffs' Bane Act claim because Plaintiffs cannot show the requisite "specific intent" to violate Luke's rights. Santa Cruz Mot. at 25; Santa Cruz Reply at 15. The Court finds that Defendants have met their burden of identifying the portions of pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

In opposition Plaintiffs fail to set forth any "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), because Plaintiffs fail to cite to any evidence of specific intent to violate Luke's rights. Instead, Plaintiffs argue only that "Defendants intentionally and

26

unlawfully shot at, tased, and had their canine bit Luke, even while he lay dying, in violation of the Fourth, First and Fourteenth Amendments." Opp'n to Santa Cruz at 24–25. However, "[e]vidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee*, 738 F. App'x at 401 (citing *Reese*, 888 F.3d at 1045). Because Plaintiffs fail to cite to any evidence of specific intent to violate Luke's rights, the Court GRANTS the Santa Cruz Defendants' motion for summary judgment on Plaintiffs' Bane Act claim against the Santa Cruz Defendants.

### b. Negligence Claim

Plaintiffs assert a negligence claim against Sergeant Ainsworth, Deputy Vigil, Deputy Eisner, Deputy Ramponi, and, vicariously, the County of Santa Cruz. Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. County of San Diego*, 305 P.3d 252, 255 (Cal. 2013). In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." *Hayes*, 305 P.3d at 255.

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes*, 305 P.3d at 255 (quoting *Nally v. Grace Community Church*, 763 P.2d 948 (Cal. 1988)) (alterations in *Hayes*). "In California, police officers 'have a duty to act reasonably when using deadly force.'" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (quoting *Hayes*, 305 P.3d at 256). "To determine police liability, a court applies tort law's 'reasonable care' standard, which is distinct from the Fourth Amendment's 'reasonableness' standard." *Vos*, 892 F.3d at 1037 (citing *Hayes*, 305 P.3d at 262). "The Fourth Amendment is narrower and 'plac[es] less emphasis on preshooting conduct.'" *Id.* (quoting *Hayes*, 305 P.3d at 262) (alteration in original); *see also C.V.*, 823 F.3d at

27

1257 n.6 (9th Cir. 2016) (noting that "state negligence law . . . is broader than federal Fourth Amendment law"). Accordingly, under California law, "tactical conduct and decisions preceding the use of deadly force" may "give[] rise to negligence liability" if they "show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes*, 305 P.3d at 263.

Here, the parties effectively dispute whether or not the officers' conduct was objectively reasonable. Santa Cruz Mot. at 25; Santa Cruz Reply at 15; Opp'n to Santa Cruz at 25. For instance, Plaintiffs argue that Plaintiffs' negligence claim "can be proven by the same wrongful acts that support their § 1983 claim." Opp'n to Santa Cruz at 25. Defendants reply that "[A]s Defendants have indicated that Eisner, Vigil, and Ramponi's use of force was reasonable, Plaintiffs cannot make out any [negligence] claim." Santa Cruz Reply at 15. Accordingly, the parties agree that the excessive force and the negligence analyses merge.

Thus, because the Court denies summary judgment with respect to the Plaintiffs' § 1983 excessive force claim against Deputies Eisner, Ramponi, and Vigil in the instant Order, the Court also DENIES summary judgment on Plaintiffs' negligence claim against Deputies Eisner, Ramponi, and Vigil, as well as the County of Santa Cruz, which may be held vicariously liable for the deputies' actions. *See, e.g.*, *M.H.*, 62 F. Supp. 3d at 1097 ("Here, the parties agree that the negligence and excessive force analyses merge. Because the Court denies summary judgment with respect to Plaintiffs' excessive force claim against the Sheriff's Deputies, it will also deny summary judgment on Plaintiffs' negligence claim against the officers.").

However, because Plaintiffs concede that the negligence claim and the excessive force analyses merge, and because the Court grants summary judgment with respect to Plaintiffs' supervisory liability claim against Sergeant Ainsworth in the instant Order, the Court also GRANTS summary judgment on Plaintiffs' negligence claim against Sergeant Ainsworth.

### c. Assault and Battery Claims

Plaintiffs assert assault and battery claims against the Santa Cruz Defendants. The Santa Cruz Defendants move for summary judgment on both claims. Santa Cruz Mot. at 25.

28

As for Plaintiffs' assault claim, the Santa Cruz Defendants argue that Plaintiffs do not have an assault claim because there was a completed battery. Santa Cruz Mot. at 25. Plaintiffs do not oppose. *See* Opp'n to Santa Cruz at 25 (discussing only Plaintiffs' battery claim and not their assault claim). Accordingly, the Court GRANTS the Santa Cruz Defendants' motion for summary judgment on Plaintiffs' assault claim.

The Court next addresses Plaintiffs' battery claim. Similar to negligence, "[u]nder California law, a plaintiff bringing a battery claim against a law enforcement official has the burden of proving the officer used unreasonable force." *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1129 (9th Cir. 2010) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269 (1998)); *see also Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999) ("A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention."). Like with Plaintiffs' negligence claim, as to Plaintiffs' battery claim, the parties effectively dispute whether or not the officers' conduct was objectively reasonable. Santa Cruz Mot. at 25; Santa Cruz Reply at 15; Opp'n to Santa Cruz at 25. Plaintiffs argue that Plaintiffs' battery claim "can be proven by the same wrongful acts that support their § 1983 claim." Opp'n to Santa Cruz at 25. Thus, like with Plaintiffs' negligence claim, the parties agree that the excessive force and the battery analyses merge.

Accordingly, because the Court denies summary judgment with respect to the Plaintiffs' § 1983 excessive force claim against Deputies Eisner, Ramponi, and Vigil in the instant Order, the Court also DENIES summary judgment on Plaintiffs' negligence claim against Deputies Eisner, Ramponi, and Vigil, as well as the County of Santa Cruz, which may be held vicariously liable for the deputies' actions. *See,* Cal. Gov't Code § 815.2; *see also e.g.*, *M.H.*, 62 F. Supp. 3d at 1098 ("The parties also agree that a viable excessive force claim precludes summary judgment with respect to Plaintiffs' assault and battery claims against the Sheriff's Deputies. For the same reason, the Court will deny summary judgment on those claims.").

However, because Plaintiffs concede that the battery claim and the excessive force

analyses merge, and because the Court grants summary judgment with respect to Plaintiffs' supervisory liability claim against Sergeant Ainsworth in the instant Order, the Court also GRANTS summary judgment on Plaintiffs' battery claim against Sergeant Ainsworth.

**B. Capitola Defendants' Motion for Summary Judgment**

The Court now turns to the Capitola Defendants' motion for summary judgment. Capitola Defendants argue that: (1) Plaintiffs' § 1983 claim against Officer Zamora fails; (2) Plaintiffs' *Monell* claim against the City of Capitola fails; (3) Savannah Smith's § 1983 right to familial relationship claim fails; and (4) Plaintiffs' related state law claims also fail. *See* Santa Cruz Mot. The Court considers each argument in turn.

**1. Section 1983 Excessive Force Claim**

Plaintiffs allege that Capitola Defendant Officer Zamora violated Luke Smith's Fourth Amendment rights by using excessive force on him. The Capitola Defendants argue that summary judgment is appropriate on Plaintiffs' § 1983 excessive force claim because Officer Zamora used objectively reasonable force and therefore did not violate the Fourth Amendment, and because Officer Zamora is entitled to qualified immunity. Capitola Mot. at 10–20.

For efficiency purposes, the Court refers the parties to Section III.A.1. for the law on excessive force and qualified immunity. Below, the Court considers (1) whether the alleged misconduct violated a constitutional right, which depends on whether or not Officer Zamora's use of force against Luke was objectively reasonable; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.

**a. Whether There Has Been a Violation of a Constitutional Right**

Whether the alleged misconduct violated a constitutional right depends on whether or not Officer Zamora's use of force against Luke was objectively reasonable. Factors for evaluating reasonableness include, but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape." *S.B.*, 864 F.3d at 1013 (citing *Graham*,

30

United States District Court
Northern District of California

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

490 U.S. at 396). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.* (quoting *Glenn*, 673 F.3d at 872).

Below, the Court addresses the four reasonableness factors set forth in *S.B.*

### i. Analysis of Reasonableness Factors

There is no dispute as to the first reasonableness factor: severity of the crime. Luke had clearly committed a serious offense when he stabbed his father and uncle multiple times. However, the parties dispute the objective reasonableness of Officer Zamora's conduct, and the Court finds that a genuine dispute of material fact exists as to the second, third, and fourth reasonableness factors: (1) whether Luke posed an immediate threat to the safety of officers or others; (2) whether Luke actively resisted arrest or attempted to escape; and (3) "other relevant factors." The Court addresses each in turn.

### a. Whether Luke Posed an Immediate Threat

Defendants' portray the facts as follows. "While en route, Zamora learned by monitoring the radio that a person was stabbed, and the suspect was on LSD, and dispatchers reported that the suspect jumped on the fire truck trying to get to the stabbing victim." Capitola Mot. at 4. "Zamora was informed that officers used less lethal 40 mm rounds intending to gain compliance, but the rounds did not stop the suspect and he fled among residences near Pioneer Road." *Id.* As for the first time Officer Zamora deployed the canine on Luke, Defendants' view is that Luke "got up within a matter of one-to-two seconds, armed and ready with the knife in his gloved hand" and that "Officer Zamora at the time and the videos show that Zamora had reasonable cause to consider [Luke] an immediate threat to people in the neighborhood and officers trying to do their duty." Capitola Reply at 8; Capitola Mot. at 17. Defendants argue that Officer Zamora released the canine again when Luke "did not stop" and "as Smith held the knife in his right hand." Capitola Mot. at 5–6. As for the third time Officer Zamora deployed the canine on Luke, Defendants argue

31

that "[Luke] lay on his back with the knife still in his hand and his hand pointing up," that "[o]fficers did not know his condition other than he was holding up the knife," and that "Zamora yelled a warning that he would send the dog to bite, and thinking [Luke] was refusing to comply and was still as dangerous as he was before, Zamora sent the dog to bite [Luke]." *Id.* at 6.

Plaintiffs' portray the facts as follows. "[T]he first time *Kato* was deployed, Luke was standing up with the knife in his right hand down by his side and his left palm down and open, and had 'started moving to his left,' but there were no officers to the left of Luke at the time." Opp'n to Capitola at 9. "The second time *Kato* was deployed, Officer Zamora could see that Luke was holding a knife in his right hand. Critically, however, Zamora admits that Luke was not doing anything with the knife." *Id.* Plaintiffs also highlight Officer Zamora deployed the canine the third time, after Luke was shot and laying on the ground. Plaintiffs write: "[w]hen Luke—whose paralyzed body could not let go of the knife—did not respond to [ ] additional pain stimuli, Officer Zamora deployed Kato to bite Luke for a third time. When asked why he did this, Zamora explained that he 'wanted to get the knife away from him. Thus, as the boy lay motionless and helpless, *Kato* thrashed and tore his arm around for nearly 20 seconds until Zamora had to physically pull *Kato* off." *Id.* at 7–8. Plaintiffs also cite that the "autopsy report reveals that some of the dog bites Luke sustained that night were 'perimortem,' meaning the bites were inflicted as Luke was dying." *Id.* at 8.

The body camera video and evidence in the record support both parties' portrayal of the facts. Thus, there is a genuine dispute of material fact as to the reasonableness factor concerning whether Luke posed an immediate threat.

### b. Whether Luke Actively Resisted Arrest or Attempted to Escape

Defendants' portray the facts as follows. "Smith fled from the stabbing scene, attacked firefights locked in their truck and then fled again, and fled a third time into the residential area before coming out, sitting down, then springing up with the knife." Capitola Mot. at 18.

Plaintiffs' portray the facts as follows. At the time officers used force against Luke, Luke

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

did not resist the officers, that "Luke only ever moved his body slowly, which does *not* warrant the intermediate, potentially deadly force used by Defendant Zamora," and that "Luke did not attempt to flee or resist when officers approached him as he was passively laying on the ground." Opp'n to Capitola at 17.

The body camera video and evidence in the record support both parties' portrayal of the facts. Thus, there is a genuine dispute of material fact as to the reasonableness factor concerning whether Luke actively resisted arrest or attempted to escape.

### c. Other Relevant Factors

Plaintiffs also cite other relevant factors, like: (2) whether the canine, *Kato*, had a tendency to bite others; (3) the length of *Kato*'s leash; (4) whether Officer Zamora should have given a warning. The Court discusses each in turn.

As to whether the canine, *Kato* had a tendency to bite others, Plaintiffs raise questions regarding *Kato*'s training, including that *Kato* was not trained to be a police dog, and that "Officer Zamora knew when he first started working with *Kato* that there was a risk the canine might bite anyone that came into contact with him." Opp'n to Capitola at 2. Plaintiffs also cite two incidents where *Kato* bit someone, despite not being commanded to do so, before the incident with Luke. *Id.* One incident concerned *Kato* repeatedly biting a woman that Officer Zamora had already detained as she was lying on the ground. *Id.* The second incident concerned *Kato* biting a California Highway Patrol officer after escaping from the backseat of Zamora's patrol car. *Id.* at 2–3. Plaintiffs assert that Officer Zamora "did not express any concerns about *Kato* and that no one from the canine program ever instructed Zamora to seek additional training for *Kato*." *Id.* at 3. By contrast, Defendants assert that "[t]he dog did not have performance problems," because "[t]he dog never bit the wrong person or any officer when out of the car and working to search for or subdue a suspect." Capitola Mot. at 9. Defendants also assert that "[t]he dog's other bites during its life and Zamora's choices while waiting for the word to act are completely irrelevant to Zamora's decision to send the dog on a 15-foot leash to bite [Luke]." *Id.* at 13. Defendants also

33

assert that the City provided continuous training for Zamora and his dog. Capitola Reply at 11.

As to the length of the leash, Defendants argue that "Zamora selected a 15-foot leash for his dog for several reasons, which is his discretion." Capitola Mot. at 4. By contrast, Plaintiffs assert that "[a]lthough Officer Zamora had a thirty-foot leash available, he selected a fifteen-foot leash for *Kato* that night," and that "Officer Zamora later explained that the shorter leash and the control he exerted over *Kato* were necessary because of *Kato*'s tendency to bite others, including nearby officers." Opp'n to Capitola at 4, 10–11.

As to whether Officer Zamora should have given a warning, Plaintiffs assert that Officer Zamora's failure to give a warning to Luke or any of the officers at the scene about what Officer Zamora was going to do before he deployed the canine was in direct violation of the City of Capitola's polices regarding canine use. Opp'n to Capitola at 6. Defendants acknowledge that the Capitola Police Policy provides that the handler should give a warning before ordering the dog to bite whenever possible, unless it would increase the risk of injury or escape. Capitola Mot. at 8. However, Defendants assert that: "To tell Smith in advance that the dog was coming, when [Luke] was looking straight at Zamora and the dog, would telegraph to be prepared to stab the dog. On the other hand, the use of surprise and hopefully overwhelming force with the canine would end the situation. There is no benefit in telling the violent suspect to be prepared to stab the dog and/or again flee." Capitola Mot. at 13. Plaintiffs argue that Defendants' assertion is belied by Officer Zamora's testimony that "it was not his decision to deploy *Kato*, instead he was simply following someone's (he did not know whose) command to deploy the canine." Opp'n to Capitola at 19.

The body camera video and evidence in the record support both parties' portrayal of the facts. Thus, there is a genuine dispute of material fact as to the reasonableness factor concerning "other relevant factors."

### d. Conclusion as to Reasonableness of Use of Force

Based on the totality of the circumstances, the Court concludes that there is a genuine dispute of material fact as to whether Officer Zamora used objectively reasonable force, and in

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

turn, whether his use of force violated Luke's Fourth Amendment rights as a matter of law. *Graham*, 490 U.S. at 396–97.

### b. Whether the Right was Clearly Established at the Time of the Alleged Misconduct

As for the second question in the qualified immunity analysis, officers are entitled to qualified immunity where their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation omitted). For a constitutional right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix*, 136 S. Ct. at 308. To do so, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quotation added).

Here, the Court cannot resolve the parties' dispute as to whether Officer Zamora's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. This is because both parties' arguments depend on whether or not Luke posed an immediate threat during the times Officer Zamora deployed the canine on Luke, and the Court has already found a genuine material dispute as to that fact. *See, e.g.*, *Lolli*, 351 F.3d at 421 (rejecting the officers qualified immunity argument "[b]ecause of the factual disputes that Lolli has identified"); *see Santos*, 287 F.3d at 855 n.12 (quoting *Saucier*, 533 U.S. at 205) ("[W]hether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend on the jury's resolution of disputed facts and the inferences it draws therefrom. Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful."); *M.H.*, 62 F. Supp. 3d at 1094 ("[T]he core issue for Plaintiffs' excessive force claim is a factual determination of . . . whether that amount of force was excessive given the circumstances. In such situations, a determination on qualified immunity will rarely be appropriate at summary judgment.").

Accordingly, the Court cannot conclude at this juncture that Officer Zamora is entitled to

35

qualified immunity on Plaintiffs' excessive force claim. Thus, the Court DENIES the Capitola Defendants' motion for summary judgment as to the § 1983 excessive force claim against Officer Zamora.

### 2. *Monell* Claim Against the City of Capitola

Plaintiffs' Thanh-Thanh Hoang and Savannah Smith allege that Defendant City of Capitola is liable under *Monell*. Defendants argue that summary judgment is appropriate on Plaintiffs' *Monell* claim against the City of Capitola because Capitola maintains a Use of Force policy and a Canine Policy. Capitola Opp'n at 20–21. The Court finds that Defendants have met their burden of identifying the portions of pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

Plaintiffs provide no opposition to Capitola Defendants' motion for summary judgment on Plaintiffs' *Monell* claim. *See* Opp'n to Capitola; *id.* at 1 (discussing only that "Plaintiffs brought Fourth Amendment excessive force claims and First and Fourteenth Amendment familial relationship claims against Defendant Officer Zamora, as well as state law claims for violation of the Bane Act (Cal. Civ. Code § 52.1), battery, and negligence against Zamora and the City of Capitola"). Indeed, Plaintiffs argue in their opposition that Officer Zamora's use of the canine violated even the Capitola Police Department's own policies regarding canine use. Opp'n to Capitola at 6, 8–9, 21.

Therefore, because Plaintiffs fail to set forth any "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), Defendants, as "the moving party[,] [are] entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. The Court thus GRANTS Capitola Defendants' motion for summary judgment on the *Monell* claim.

### 3. Savannah Smith's 1983 Right to Familial Relationship Claim

Plaintiffs allege a § 1983 claim for loss of familial relationship under the First and Fourteenth Amendments against Officer Zamora. Capitola Defendants move for summary judgment only as to Plaintiff Savannah Smith's right to familial relationship claim and not as to

36

Thanh-Thanh Hoang and Ian Smith's right to familial relationship claim. *See* Capitola Mot. at 23–24. Capitola Defendants argue that: (1) Plaintiff Savannah Smith has no standing to assert this claim; and (2) the Capitola Defendants are entitled to summary judgment on this claim because Plaintiffs cannot show that Officer Zamora acted with a purpose to harm Luke unrelated to legitimate law enforcement objectives. Capitola Mot. at 23–24. However, as discussed in Section III.A.4.a., the Court has already found that Savannah Smith has standing to assert such a claim. Thus, the Court DENIES the Capitola Defendant's motion for summary judgment on Savannah Smith's right to familial relationship claim for lack of standing. The Court now turns to Defendants' second argument, which concerns whether Officer Zamora acted with a purpose to harm Luke that was unrelated to legitimate law enforcement objectives.

Defendants argue that Officer Zamora acted with a legitimate police purpose to apprehend Luke because he used the dog to shake the knife from Luke's hand. Capitola Mot. at 23–24. In opposition, Plaintiffs argue that "[a] reasonable jury could readily conclude that Zamora's actions in this case were carried out with a purpose to harm Luke that was unrelated to any legitimate law enforcement objective" because "the evidence establishes that Zamora repeatedly violated his own department's policies regarding canine use by deploying Kato in the absence of an imminent threat of violence or serious harm to the public, any officer, or Zamora." Opp'n to Capitola at 21. The Court also finds it bears repeating the Plaintiffs' statements in the opposition to the Santa Cruz Defendant's motion, that "[a] reasonable jury could find that the defendant officers, especially, especially Defendants Ramponi and Zamora, acted without a legitimate law enforcement purpose when they chose to fire a 40 millimeter and sic a canine again on a paralyzed dying boy who had just been shot by an AR-15." Opp'n to Santa Cruz at 23–24 (citing *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (finding that head stomping person who was already shot and on the ground could sustain a due process claim).

Here, the Court concludes that there is a genuine dispute of material fact as to whether Officer Zamora acted with a purpose to harm Luke unrelated to legitimate law enforcement

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

objectives. Therefore, the Court DENIES the Capitola Defendant's motion for summary judgment on Plaintiffs' right to familial relationship claim against Officer Zamora.

### 4. State Law Claims

Plaintiffs also bring three state law claims against the Capitola Defendants: (1) Bane Act claim; (2) negligence; and (3) assault and battery. The Court addresses each of these claims in turn.

#### a. Bane Act Claim

Plaintiffs bring a Bane Act claim against Officer Zamora and the City of Capitola. The Capitola Defendants move for summary judgment on Plaintiffs' Bane Act claim.

As previously discussed with regards to the Santa Cruz Defendants' motion for summary judgment, the Ninth Circuit held that "the Bane Act does not require the threat, intimidation or coercion element of the claim to be transactionally independent from the constitutional violation alleged," but the Bane Act does require "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese*, 888 F.3d at 1043 (internal quotation marks omitted). "Evidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee v. City of Chico*, 738 F. App'x 401 (9th Cir. June 18, 2018) (citing *Reese*, 888 F.3d at 1045). "Rather, [the plaintiff] must show that [the officer] 'intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances.'" *Id.* (quoting *Reese*, 888 F.3d at 1045).

Here, Capitola Defendants argue that they are entitled to summary judgment on Plaintiffs' Bane Act claim because Plaintiffs cannot show the requisite "specific intent" to violate Luke's rights. Capitola Mot. at 22; Capitola Reply at 13–14. The Court finds that Defendants have met their burden of identifying the portions of pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

In opposition Plaintiffs fail to set forth any "specific facts showing that there is a genuine

38

United States District Court
Northern District of California

issue for trial," Fed. R. Civ. P. 56(e), because Plaintiffs fail to cite to any evidence of specific intent to violate Luke's rights. Instead, Plaintiffs argue only that "Defendant Zamora intentionally and unlawfully deployed his defective canine to bite Luke, even while he lay dying, in violation of the First, Fourth, and Fourteenth Amendments." Opp'n to Capitola at 23–24. However, "[e]vidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee*, 738 F. App'x at 401 (citing *Reese*, 888 F.3d at 1045). Because Plaintiffs fail to cite to any evidence of specific intent to violate Luke's rights, the Court GRANTS the Capitola Defendants' motion for summary judgment on Plaintiffs' Bane Act claim against the Capitola Defendants.

### b. Negligence Claim

Plaintiffs assert a negligence claim against Officer Zamora and, vicariously, the City of Capitola. Like the Santa Cruz Defendants' motion for summary judgment briefing, both Plaintiffs and the Capitola Defendants agree that the excessive force and the negligence analyses merge. Capitola Mot. at 22–23; Opp'n to Capitola at 24.

Thus, because the Court denies summary judgment with respect to the Plaintiffs' § 1983 excessive force claim against Officer Zamora, the Court also DENIES summary judgment on Plaintiffs' negligence claim against Officer Zamora, as well as the City of Capitola, which may be held vicariously liable for Officer Zamora's actions. *See, e.g., M.H.*, 62 F. Supp. 3d at 1097 ("Here, the parties agree that the negligence and excessive force analyses merge. Because the Court denies summary judgment with respect to Plaintiffs' excessive force claim against the Sheriff's Deputies, it will also deny summary judgment on Plaintiffs' negligence claim against the officers.").

### c. Assault and Battery Claims

Plaintiffs assert assault and battery claims against the Capitola Defendants. The Capitola Defendants move for summary judgment on both claims. Capitola Mot. at 22–23.

39

Plaintiffs do not oppose the Capitola Defendants' motion for summary judgment on Plaintiffs' assault claim. *See* Opp'n to Capitola at 24–25 (discussing only Plaintiffs' battery claim and not their assault claim). Accordingly, the Court GRANTS the Capitola Defendants' motion for summary judgment on Plaintiffs' assault claim.

The Court next addresses Plaintiffs' battery claim. Like with Plaintiffs' negligence claim, as to Plaintiffs' battery claim, the parties effectively dispute whether or not the officers' conduct was objectively reasonable. Capitola Mot. at 22–23; Capitola Reply at 14–15; Opp'n to Capitola at 24–25. Plaintiffs argue that Plaintiffs' battery claim "can be proven by the same wrongful acts that support their § 1983 claim." Opp'n to Capitola at 24. Thus, like with Plaintiffs' negligence claim, the parties agree that the excessive force and the battery analyses merge.

Accordingly, because the Court denies summary judgment with respect to the Plaintiffs' § 1983 excessive force claim against Officer Zamora in the instant Order, the Court also DENIES summary judgment on Plaintiffs' negligence claim against Officer Zamora, as well as the City of Capitola, which may be held vicariously liable for the deputies' actions. *See,* Cal. Gov't Code § 815.2; *see also e.g.*, *M.H.*, 62 F. Supp. 3d at 1098 ("The parties also agree that a viable excessive force claim precludes summary judgment with respect to Plaintiffs' assault and battery claims against the Sheriff's Deputies. For the same reason, the Court will deny summary judgment on those claims.").

## IV. CONCLUSION

### 1. Conclusion as to Santa Cruz Defendants

For the reasons given above, the Court rules as follows on the Santa Cruz Defendants' motion for summary judgment:

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' § 1983 excessive force claim against Deputies Eisner, Ramponi, and Vigil is DENIED;

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' supervisory liability claim against Sergeant Ainsworth is GRANTED;

40

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' *Monell* claim against the County of Santa Cruz and Sheriff Hart is GRANTED;

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' § 1983 right to familial relationship claim is GRANTED as to Sergeant Ainsworth, Deputy Vigil, and Deputy Eisner, but DENIED as to Deputy Ramponi;

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' Bane Act claim against the Santa Cruz Defendants is GRANTED;

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' negligence claim is DENIED as to Deputies Eisner, Ramponi, and Vigil and the County of Santa Cruz, but GRANTED as to Sergeant Ainsworth;

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' assault claim against the Santa Cruz Defendants is GRANTED;

- The Santa Cruz Defendants' motion for summary judgment on Plaintiffs' battery claim is DENIED as to Deputies Eisner, Ramponi, and Vigil and the County of Santa Cruz, but GRANTED as to Sergeant Ainsworth.

### 2. Conclusion as to Capitola Defendants

For the reasons given above, the Court rules as follows on the Capitola Defendants' motion for summary judgment:

- The Capitola Defendants' motion for summary judgment on Plaintiffs' § 1983 excessive force claim against Officer Zamora is DENIED;

- The Capitola Defendants' motion for summary judgment on Plaintiffs' *Monell* claim against the City of Capitola is GRANTED;

- The Capitola Defendants' motion for summary judgment on Plaintiff Savannah Smith's § 1983 right to familial relationship claim against Officer Zamora is DENIED;

- The Capitola Defendants' motion for summary judgment on Plaintiffs' Bane Act

41

Case Nos. 17-CV-05095-LHK; 17-CV-06594-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

claim against the Capitola Defendants is GRANTED;

- The Capitola Defendants' motion for summary judgment on Plaintiffs' negligence claim against Capitola Defendants is DENIED;

- The Capitola Defendants' motion for summary judgment on Plaintiffs' assault claim against the Capitola Defendants is GRANTED;

- The Capitola Defendants' motion for summary judgment on Plaintiffs' battery claim against Capitola Defendants is DENIED.

**3. Surviving Claims**

The following claims survive summary judgment:

- Plaintiffs' § 1983 excessive force claim against Deputies Eisner, Ramponi, and Vigil, and Officer Zamora;

- Plaintiffs' 1983 right to familial relationship claim against Deputy Ramponi and Officer Zamora;

- Plaintiffs' negligence claim against Deputies Eisner, Ramponi, and Vigil, the County of Santa Cruz, Officer Zamora, and the City of Capitola;

- Plaintiffs' battery claim against Deputies Eisner, Ramponi, and Vigil, the County of Santa Cruz, Officer Zamora, and the City of Capitola.

**IT IS SO ORDERED.**

Dated: June 17, 2019

_Lucy H. Koh_
LUCY H. KOH
United States District Judge